IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TERRENCE McCARTNEY,                    )
                                       )
                 Plaintiff,            )
                                       )
         v.                            )     Civil Action No. 07-1572
                                       )     Magistrate Judge Lisa Pupo Lenihan
                                       )
COMMISSIONER OF SOCIAL                 )
SECURITY,                              )     Doc. Nos. 11 & 14
                                       )
                 Defendant.            )


## OPINION

**LENIHAN, M.J.**

Currently before the Court for  disposition are Plaintiff's Motion for Summary Judgment
(Doc. No. 11) and Defendant's Motion for Summary Judgment (Doc. No. 14) in this Social Security
appeal.  For the reasons set forth below, the Court will deny the Plaintiff's Motion, grant the
Defendant's, and affirm the decision of the Commissioner of Social Security to deny Plaintiff's
application for benefits.


I.      **PROCEDURAL HISTORY**

On November 16, 2007, Terrence McCartney ("Plaintiff"), by his counsel, timely filed a
complaint pursuant to Section 205(g) and of the Social Security Act, as amended, 42 U.S.C. §
405(g), for review of the Commissioner's final determination disallowing his claim for disability
insurance benefits ("DIB") and supplemental security income ("SSI") under titles II and XVI of the
Social Security Act, 42 U.S.C. § 401-433, 1381-1383f.  The history of Plaintiff's claim is as follows.

On January 14, 2004, Plaintiff protectively filed for DIB and SSI payments alleging that he became disabled on July 23, 2003 due to head and neck injuries that allegedly resulted when he fell off the step of his tractor-trailer truck and hit his head while working as a truck driver. Plaintiff claims to suffer from bad head aches, dizziness, memory problems, left arm and hand numbness and weakness, and neck and back pain, as a result of his head and neck injuries. On September 14, 2001, the Social Security Administration denied his initial applications. Plaintiff filed a timely request for a hearing which was held on March 22, 2006 before Administrative Law Judge Michael F. Colligan (ALJ), at which Plaintiff appeared and testified. On April 25, 2007, the ALJ denied Plaintiff's claim for benefits, concluding that although Plaintiff had severe impairments,[1] he retained the residual functional capacity to perform a significant range of light, unskilled work, with certain restrictions, and that such work existed in significant numbers in the national economy . (R. 28-30.) On June 18, 2007, Plaintiff filed a timely request for review of the ALJ's decision (R. 10), which the Appeals Council denied on September 18, 2007 (R. 4). Plaintiff then filed the present action in this Court.

On appeal to this Court, Plaintiff claims the ALJ erred in three respects: (1) the ALJ erred as a matter of law at step two of the sequential evaluation process when he found that Plaintiff's headaches following his accident were not severe, despite evidence that his headaches had more than a *de minimus* impact on his ability to work; (2) the ALJ erred as a matter of law at step five when he failed to include, explicitly or implicitly, any limitations related to Plaintiff's headaches in his hypothetical question to the vocation expert and therefore, the vocation expert's response does not provide substantial evidence to support the ALJ's decision to deny benefits; and (3) the ALJ

---

1. The ALJ determined that Plaintiff has the following severe impairments: status post closed head injury and cognitive disorder due to his head injury, personality change due to his head injury, and a major depressive disorder. (R. 18.)

committed clear error when he failed to take in to account Plaintiff's military service and work history of twenty-plus years in making his credibility assessment of Plaintiff.   For the reasons set forth below, the Court finds no merit to Plaintiff's arguments.

## II.    STATEMENT OF FACTS

Plaintiff was born on April 19, 1959 and was thus 46 as of the date of his administrative hearing. He has a high school education, followed by seven years in the United States Marine Corps. (R. 54.) After being honorably discharged from the Marine Corps in October 1983, Plaintiff worked as a truck driver from April 1993 until his accident in July 2003. (R. 54, 68, 79, 105-06.)  The vocational expert testified that Plaintiff's work as a truck driver at the time of his accident, which involved securing a load with a tarp and chains to a flatbed tractor trailer, was performed at the medium and heavy exertional levels and was semi-skilled work.  (R. 296.)

Plaintiff alleges that his disability began on July 28, 2003 (R. 54), as a result of head and neck injuries sustained when he fell off a step of his tractor trailer truck on that same date. (R. 67.) In particular, Plaintiff claims that he suffers from the following conditions which limit his ability to work: bad headaches, dizziness, bad memory, neck and back pain, and numbness in his left arm and hand.  (R. 67.)[2]  Plaintiff received a small settlement for his workers' compensation claim related to the July 28, 2003 accident.  Plaintiff attempted to return to work on two occasions in 2005 since his accident–the first attempt lasted a little over one month, while the second attempt lasted only one week.  (R. 104.)

---

2.  On the Disability Report - Appeal dated September 10, 2004, Plaintiff reported that he has severe headaches, depression, back pain and seizures, and he has memory and concentration problems, and is in constant pain.  (R. 87, 93.)

The medical records show that immediately following his accident on July 28, 2003, Plaintiff was taken to the outpatient emergency room department at Licking Memorial Hospital, complaining of head injury, headaches and dizziness, mild vertigo with head movement, mild nausea, some blurring of vision, and some soreness and stiffness to posterior neck. (R. 111-14.) X-rays of the cervical spine revealed significant arthritis but no acute fracture or dislocation, and no soft tissue edema was noted. (R. 113.) A CT scan of the head revealed no acute injury. (R. 114.) The emergency room physician diagnosed a concussion, cervical sprain, and cervical arthritis. Plaintiff was given a prescription for percocet and recommended that he be reevaluated with his primary care physician (PCP) when he returned home. (R. 112.)

On September 25, 2003, Plaintiff had another CT scan done of his head at the request of his PCP, Dr. Philip Iozzi. (R. 131.) The results of that scan revealed small, focal cerebral lesions, non-specific, possibly presenting old ischemically involved areas. There was no indication of obvious new or recent abnormality.

Upon receiving the results of the September 25, 2003 CT scan, Dr. Iozzi referred Plaintiff to a neurologist, Dr. Barry Resnick. Plaintiff first treated with Dr. Resnick on October 16, 2003. (R. 195-97.) At that time, Dr. Resnick noted that Plaintiff complained of a headache since the accident, as well as left arm problems and some incoordination in the arm. Plaintiff's left arm problems were supported by an EMG and nerve conduction studies, which revealed left median nerve entrapment. Dr. Resnick further noted Plaintiff's complaints of episodes of confusion and difficulty remembering details since the accident. Plaintiff's only medication at that time was aspirin. Dr. Resnick impressions were (1) ataxia in the left arm, further complicated by Plaintiff's left-handedness (or being ambidextrous); and (2) confusional episode possibly due to other trauma

to brain at the time of the accident.  Dr. Resnick ordered an MRI scan of the brain and an EEG.

An MRI scan of Plaintiff's brain was performed on November 3, 2003, which revealed numerous deep white matter hyperintensities in the periventricular and subcortical regions of both cerebral hemispheres, predominantly in the frontal and parietal regions.  (R. 255.)  These findings were suggestive of a demyelinating disorder, such as multiple sclerosis, or possibly chronic ischemia from small vessel disease.  (Id.)  An EEG was conducted on November 8, 2003, which revealed normal awake and drowsy EEG.  (R. 119.)

On November 25, 2003, Plaintiff was again seen by Dr. Resnick for a follow up visit and the results of the diagnostic tests.  (R. 193-94.)  Dr. Resnick noted that Plaintiff still had ataxia in the left arm and a headache.  Dr. Resnick further noted that the MRI findings suggested demyelinating disease, and he ordered a cerebral spinal fluid (CSF) examination to evaluate his condition further.

Plaintiff next saw Dr. Resnick on January 9, 2004 for the results of the CSF procedure.  (R. 184-85.)  At that time, Plaintiff stated he had no improvement with his symptoms and in fact stated that his left hand felt weaker.  The results of the CSF exam showed cell counts ranging between 4 and 6 white cells with no red cells; protein level was 63 with a glucose of 69; the IgG index was markedly elevated at 14.1.  Based on the physical findings on examination, the MRI findings and the results of the CSF, Dr. Resnick diagnosed Plaintiff with probably multiple sclerosis.  He suggested a treatment consisting of a trial of immunomodulating agents, but Plaintiff refused to consider any form of injectable agents.  Plaintiff was placed on prednisone with a 15-day taper.

On January 16, 2004, Plaintiff presented to the emergency room of Aliquippa Community Hospital complaining of blood trickling from his left ear, and reported having severe headaches for

several months. (R. 132-38.) Plaintiff was diagnosed with an ear infection/inflammation and discharged with medication.

On February 9, 2004, Plaintiff was again seen by Dr. Resnick. (R. 182-83.) Plaintiff's biggest complaint at that time was headaches, which he has had since his accident. Plaintiff completed his course of prednisone and reported that his headaches had improved but his left arm ataxia did not. Dr. Resnick prescribed Elavil 25 mg. for his headaches, and also encourage Plaintiff to try over-the-counter medications. Plaintiff noted that he has tried Excedrin Migraine and Alelve in the past, and the former has helped, but Aleve did not.

Plaintiff sought a second opinion from another neurologist, Dr. Marina Zaretskaya, on February 5, 2004. (R. 218-220.) Dr. Zaretskaya's neurological exam revealed that Plaintiff was awake, alert and appropriate, and was able to provide information regarding his present illness and past medical history. The exam also revealed that Plaintiff missed a point on the left side while performing finger to nose probe. Dr. Zaretskaya noted that Plaintiff's sister was also present during the exam and she provided additional information and reported that she noticed a dramatic change in Plaintiff's short-term memory, as well as his affect. Dr. Zaretskaya reviewed the report of his MRI and was concerned that it was done without contrast strudy. Dr. Zaretskaya also reviewed the results of his CSF analysis and the office notes of Dr. Resnick. Dr. Zaretskaya's impression was headaches, left arm numbness sensation of undetermined etiology, memory decline and abnormal MRI. Dr. Zaretskaya ordered another MRI scan of the brain with contrast, and an MRI of the cervical and thoracic spine.

On February 7, 2004, Plaintiff underwent an MRI of his thoracic spine with and without contrast. (R. 257.) The results revealed a small central posterior disc protrusion at T9-10, but was

otherwise unremarkable. On that same date, an MRI of the brain was conducted with and without contrast. (R. 258.) The results of that MRI showed multiple areas of abnormal signal intensity in the supratentorial white matter bilaterally which, for a person of Plaintiff's age, was suspicious for a demyelinating disease such as multiple sclerosis. Other possibilities included inflammation/infection and chronic small vessel ischemic disease.

Plaintiff presented again to Dr. Zaretskaya on February 12, 2004 to review his test results. (R. 215-217.) Plaintiff's main concern continued to be memory decline, numbness sensation in his left arm, and headaches. Dr. Zaretskaya noted that the abnormal result on the MRI of Plaintiff's brain is consistent with the diagnosis of multiple sclerosis. Dr. Zaretskaya discussed with Plaintiff and his sister different treatment options for multiple sclerosis and provided them with information on various medications. Dr. Zaretskaya ordered prolonged EEG studies,[3] started Plaintiff on physical therapy with massage therapy for his neck discomfort and headaches, and referred Plaintiff to Dr. Michael Franzen for a neuropsychological evaluation for his memory decline.

On April 16, 2004, Plaintiff presented to Michael Franzen, Ph.D.,[4] for a neuropsychological evaluation to determine whether his memory problems were due to an organic brain injury or a result of his affective difficulties. (R. 250.) During that evaluation, Plaintiff stated to Dr. Franzen that since the accident, he has experienced significant problems with short-term memory, significant anxiety and depression, chronic headaches, and poor sleep. Plaintiff further reported that although he was diagnosed with multiple sclerosis in December of 2003, he was not currently experiencing

_____

3. The prolonged EEG studies were conducted on February 21, 2004 and revealed no abnormalities. (R. 256.)

4. Dr. Franzen was Chief of Psychology/Neuropsychology at Allegheny General Hospital at the time of the neuropsychological evaluation. (R. 254.)

any symptoms. Dr. Franzen administered a number of tests to assess intelligence, attention/concentration, memory, visuo-perception, -construction and -motor skills, cognitive/executive functioning, and personality traits and clinical symptoms. (R. 250-53.) The results of these tests indicated that Plaintiff was not exaggerating or fabricating his neuropsychological deficits, particularly in the area of memory. The results further revealed significant difficulties with attention and impulsivity; difficulties with vigilance; average to low average in all measures of memory; no indication of difficulty with visuo-perception or -construction skills; evidence of impairment with fine motor coordination; executive functioning ranged from borderline to average; some difficulty with inhibition; difficulty with attention and concentration; difficulty with depression; and endorsement of some suicidal ideation. Dr. Franzen's diagnostic impressions were: (1) Cognitive Disorder NOS; (2) Major Depressive Disorder, Single Episode, Moderate; (3) Personality Change due to head injury, combined type (with features of disinhibition, aggression, and paranoia). Dr. Franzen also assessed a Global Functioning Assessment (GAF) score of 45.[5]

Based on the results of his neuropsychological evaluation, Dr. Franzen concluded that Plaintiff had significant difficulties with attention, vigilance, and impulsivity. (R. 254.) He further concluded that Plaintiff's overall memory abilities were fairly consistent and in the low average range, and his ability to retrieve and retain information remained in the average range. Dr. Franzen further concluded that Plaintiff had superior visuo-constructional and -perceptional abilities, but

---

5. A score of 45 on the Global Assessment of Functioning (GAF) Scale falls within the 41 to 50 range, which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, 4th ed. at 32 (Am. Psychiatric Ass'n 1994).

noted evidence of bilateral impairment of Plaintiff's fine motor coordination. Also, Dr. Franzen concluded that Plaintiff's problem-solving ability is average, and noted executive functioning deficits in the areas of inhibition and cognitive speed. Dr. Franzen opined that Plaintiff was currently experiencing cognitive deficits consistent with a closed head injury, and the evidence suggested that he was having difficulty coping with feelings of depression and anxiety, and had endorsed some suicidal ideation. Dr. Franzen recommended that Plaintiff undergo therapy to learn strategies to compensate for his cognitive deficits and skills for appropriately coping with depression and anger and suggested referral to a psychiatrist for management of psychotropic medications. (Id.)

On April 23, 2004, Plaintiff was again seen by Dr. Zaretskaya for a follow up appointment and to obtain the results of his EEG, which was normal. (R. 241.) Dr. Zaretskaya noted that Plaintiff reported that physical therapy helped him dramatically, as his dysesthesia sensation and numbness sensation completely resolved and he achieved dramatic improvement with his headaches. Dr. Zaretskaya noted that he had prescribed Pamelor therapy for Plaintiff's headaches but Plaintiff could not tolerate it and discontinued it. Dr. Zaretskaya also discussed Dr. Franzen's report and recommendations with Plaintiff. Dr. Zaretskaya's impressions were status/post-accident, with headaches, behavioral changes and memory decline, which has been slowly improving. (R. 242.) Dr. Zaretskaya recommended a course of prophylaxis therapy to help Plaintiff with his memory, headaches, and energy level, which was also recommended by Dr. Franzen, and prescribed a course of Effexor therapy. Dr. Zaretskaya also suggested a referral to the brain injury center with Dr. Goldberg to see if rehabilitation therapy plus involvement of a psychologist, would help.

A Residual Functional Capacity Assessment - Mental (RFC-Mental) and Psychiatric Review Technique (PRT) were completed on May 28, 2004 by Manella C. Link, Ph.D. (R.156-71.) The

PRT indicates that Plaintiff suffers from a medically determinable impairment that does not precisely satisfy the diagnostic criteria of Listing 12.02 Organic Mental Disorders, and identifies the disorder as "Cognitive Disorder, NOS with Personality Changes contributed to head trauma." (R. 157.) The PRT further indicates that Plaintiff suffers from a medically determinable impairment that does not precisely satisfy the diagnostic criteria of Listing 12.04 Affective Disorders, and identifies the disorder as "Major Depressive Disorder." (R. 159.) The PRT also assessed Plaintiff's functional limitations under the "B" criteria of Listings 12.02 and 12.04. (R. 166.) Mild limitation was noted with regard to ADLs and maintaining social functioning, while moderate limitation was found to exist as to maintaining concentration, persistence or pace. (Id.)

The RFC-Mental assesses moderate limitations in the areas of understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, being able to work in close proximity to others without being distracted, accepting instructions and responding appropriately to criticism from supervisors, and responding appropriately to changes in the work setting. (R. 169-70.) In all other areas, Plaintiff was rated as not significantly limited. In the explanation of findings, the reviewing psychologist noted the results of Dr. Franzen's neuropsychological testing of Plaintiff, as well as his past work history, extensive training and certifications through the military, and independent ADLs, in concluding that Plaintiff's limitations from his impairments do not preclude him from meeting the basic mental demands of competitive work on a sustained basis. (R. 171.)

On June 15, 2004, Plaintiff was seen again by Dr. Zaretskaya for a follow up appointment and complained that he continued to have problems with headaches and memory decline, with

difficulty concentrating, and has exhibited some behavioral changes and mood alterations. (R. 239.) Dr. Zaretskaya noted Plaintiff was improving on the Effexor therapy and would continued to be followed by him. Dr. Zaretskaya also referred Plaintiff to Dr. Goldberg at the Brain Injury Center at Mercy Hospital and to neuropsychologist, Dr. Rubinsky. (R. 240.) As for the possible demyelinating disorder, Plaintiff indicated he did not want to undergo immunomodulating therapy at that time, but preferred to be followed with serial MRIs.[6]

A Residual Functional Capacity Assessment - Physical (RFC-Physical) was completed on June 18 and 21, 2004 by a state agency medical consultant, Dr. Frank Bryan, M.D. (R. 172-81.) The state agency medical consultant assessed the following exertional limitations: lift and/or carry 20 lbs. occasionally and 10 lbs. frequently; stand and/or walk and sit 6 hours in an 8-hour work day. (R. 173.) No other limitations of any kind were noted. (R. 174-77.) In his explanation of findings, the medical consultant discussed the reports of Plaintiff's treating neurologists, Doctors Resnick and Zaretskaya, and noted incorrectly that the results of the enhanced MRI of Plaintiff's brain was within normal limits. (R. 180.) The medical consultant also noted that Plaintiff lived alone, had headaches and neck pain, and was currently going to physical therapy. (R. 181.) The medical consultant remarked that Plaintiff left many of his ADLs blank, yet noted several tasks that Plaintiff was able to perform with regard to self grooming/self-care activities, carrying and unloading groceries, and ambulating. (Id.) The medical consultant did note, however, that Plaintiff reported being able to walk about ½ mile but then must stop due to pain, and that sometimes bending over quickly made

---

6. Dr. Zaretskaya opined that the abnormal MRI findings, suggestive of demyelinating disorder, were not related to the accident in July of 2003 and did not cause the accident. (R. 240.) However, in Dr. Zretskaya's opinion, Plaintiff's memory decline, current behavioral changes, and cognitive decline were all related to the accident in July of 2003, when he hit his head and lost consciousness, as Plaintiff's neuropsychological testing was consistent with a closed head injury. (Id.)

him dizzy.  (Id.)  Based on the above, the medical consultant concluded that Plaintiff answered his ADLs in a partially credible manner, and to the extent that he alleged being totally precluded from work-related activities, Plaintiff's subjective complaints regarding the severity of limitations caused by the impairments were not fully credible.  (R. 181.)

On June 28, 2004, Plaintiff saw Dr. Zaretskaya for a follow up visit.  (R. 236-37.)  Dr. Zaretskaya noted that Plaintiff reported he could not tolerate the Effexor therapy and discontinued it on his own.  Plaintiff also reported that he completed physical therapy, which helped him dramatically.  Plaintiff reported that he continues to suffer from intermittent headaches, but they are not as severe as before and he could certainly function with that.  Dr. Zaretskaya also noted that Plaintiff does not like to take medication and prefers to recuperate on his own; he was currently not taking any medications; Plaintiff appeared in good spirits and was looking forward to returning to work soon.  Also, Dr. Zaretskaya noted that Plaintiff's headaches have been improving and were almost resolved.  Dr. Zaretskaya again discussed with Plaintiff the presence of abnormalities on his MRI, but he had no new neurological symptoms and decided to forego any treatment at that time and instead obtain another MRI in November of 2004.  Dr. Zaretskaya also noted that Plaintiff would attempt to return to work.  (R. 237.)

An MRI scan of the brain with and without contrast was done on November 8, 2004.  (R. 249.)  The results of that MRI revealed persistent multiple focal areas of signal abnormality within the white matter of the brain.  Some of the focal signal abnormalities that were present in the 2003 MRI were resolved but others were still present, and those remained unchanged in size or appearance.  However, a new abnormal focus was seen in the left parietal lobe.  On December 3, 2004, Plaintiff was seen by Dr. Zaretskaya for a follow up and review of MRI results.  (R. 234-35.)

Plaintiff reported that he started to have headaches again and had started to bruise easily. (R. 234.) Dr. Zaretskaya wondered if Plaintiff's intermittent headaches were related to the abnormalities on the MRI, and prescribed Pamelor therapy at night. Dr. Zaretskaya referred Plaintiff to a neuro-ophthalmologist, ordered blood work to be followed up by his PCP for complaints of easy bruising. Dr. Zaretskaya again counseled Plaintiff of the need to being treating his demyelinating disorder and offered him a second opinion at the MS clinic at UPMC. (R. 235.)

Plaintiff was seen by Dr. David Rhodes, M.D. for a neuro-ophthalmology consult on January 2, 2005. (R. 246.) Dr. Rhodes diagnosed Plaintiff with an astigmatism and presbyopia, and ruled out involvement of the optic nerve by the demyelinating condition. On January 28, 2005, Plaintiff returned to see Dr. Zaretskaya, who reviewed the results of his neuro-ophthalmology evaluation with Dr. Rhodes. (R. 232-33.) Dr. Zaretskaya also noted that Plaintiff continued to suffer from muscle discomfort, although he never started the Pamelor therapy, and would follow up with his PCP for possible referral to physical therapy and/or chiropractic manipulations. Plaintiff indicated that he was ready to initiate Avonex therapy and would receive the shots in his PCP's office. Upon neurological exam, Dr. Zaretskaya noted that Plaintiff had normal recent and remote memory; good attention span and concentration; normal language function; and a good fund of knowledge.

Six months later, Plaintiff was seen by Dr. Zaretskaya for a follow up visit on July 28, 2005, at which time Plaintiff reported that he had been feeling wonderful and had no problems or complaints, and that he would like to return to work. (R. 230.) Dr. Zaretskaya's neurological examination revealed normal findings. Dr. Zaretskaya opined that he saw no reason for Plaintiff not to go back to work at that time, and instructed Plaintiff to follow up with his PCP. (R. 231.) Dr. Zaretskaya further instructed Plaintiff to call if he developed any problems or symptoms.

On December 9, 2005, Plaintiff presented to Dr. Zaretskaya on an emergency basis complaining of a numbness sensation in his left hand for the past week. (R. 228.) The neurological examination revealed some sensory problems with his left hand and also in the biceps area of left arm. (R. 229.) Dr. Zaretskaya noted decreased sensation to touch and cold in the left. The doctor's impression was a long history of demyelinating disorder, and he was concerned that Plaintiff's sensory problems might be a presentation of exacerbation of his disease. Dr. Zaretskaya ordered an MRI of the cervical spine. On December 23, 2005, Plaintiff underwent an MRI scan of his cervical spine and brain. (R. 243-44.) The results of the MRI of the cervical spine showed normal cord signal with no foces of demyelination, but revealed central disc herniation at C4-C5 and small left paracentral disc herniation at C6-C7. (R. 243.) The MRI of Plaintiff's brain showed multiple bilateral deep white matter periventricular abnormal signals without enhancement. The radiologist noted these findings were consistent with Plaintiff's known multiple sclerosis, and the lesions appeared stable. (R. 244.)

On February 28, 2006, Plaintiff was examined by Dr. M.A. Barmada at the Neurology Clinic at Mercy Hospital at the referral of Dr. Zaretskaya. (R. 264-66.) Dr. Barmada's notes indicate that Plaintiff was complaining of occipital headaches, squeezing type, with a pain level of 5 out of 10, which increased with neck movement, increased visual blurring, in the past two months, and nausea and vomiting for the past two months. (R. 264.) Dr. Barmada also noted that Plaintiff was diagnosed with multiple sclerosis three years ago. His impression was asymptomatic multiple sclerosis with headaches. Dr. Barmada recommended that Plaintiff continue on Ibuprofen, have an x-ray of the cervical spine to rule out spondylosis and an eye evaluation, undergo physical therapy, and repeat the MRI in December of 2006, with a follow up visit in one year. (R. 264-66.)

A disability hearing was held before the ALJ on March 22, 2006, at which Plaintiff appeared along with his counsel. (R. 279.) At that hearing, the ALJ questioned Plaintiff regarding his headaches, and Plaintiff responded that he constantly has headaches, and the pain level at the hearing was three out of ten, but sometimes in the evenings, the pain level is upwards of nine out of ten. (R. 290.) Plaintiff testified his doctor has tried him on several different medications, but they only dulled the pain, and did not get rid of it. (Id.) Plaintiff testified that he had been having trouble over the last 2 ½ to 3 years, and sometimes he could not sleep for days because his head and neck hurt so bad. (Id.) When he first sustained his head and neck injuries in July of 2003, Plaintiff testified he would not sleep for 3 to 4 days at a time, sometimes he would go several months. (R. 291.) At the time of the hearing, Plaintiff testified that he was sleeping okay most of the time but his head and neck pain still woke him up at night. (R. 291-92.) Plaintiff further testified that his head and neck pain and drowsiness due to lack of adequate sleep affected his concentration on a daily basis. (R. 291.) Despite his drowsiness, Plaintiff testified that normally he did not take naps during the day. (R. 294-95.)

In describing the impairments that prevented him from working, Plaintiff testified at the disability hearing that he has "[a] lot of memory problems, a lot of pain in the back left side of his head and neck." (R. 284.) Later, when asked by his counsel why he feels he is disabled and could not work, Plaintiff responded "the way my memory's been acting, the way it makes me feel, the head, the neck, I honestly don't think that I should be out there driving a truck. . . . I've tried to go back to work twice, and the way it made me feel with the headaches . . . I drove back home in an empty tractor and trailer from Florida in tears the whole way home." (R. 289.) The ALJ also asked Plaintiff if he was still having problems with using his left hand, to which Plaintiff responded that

he is not having problems using it but every once in a while it just goes dead, he cannot feel anything. (R. 287.) Plaintiff also testified that he did not have a problem walking until he injured his left ankle recently. (Id.)

As to his activities of daily living, Plaintiff testified that he lives alone, is able to take care of his meals and straighten up his apartment, is able to go grocery shopping and play cards with friends, is able to drive but usually no more than three miles to see his doctor or go to the grocery store, has no difficulty dressing or with personal grooming. (R. 284-85, 293.) Plaintiff further testified that his sister sometimes drives him to his doctor's appointments, and that he is able to handle his finances. (R. 294.)

An impartial vocational expert, Sam Edelmann, also appeared at the hearing and testified. The ALJ posed the following hypothetical question to the vocational expert:

> I'm going to ask that you assume that we have an individual the same age, education and work history as this claimant. In addition, assume that on an exertional basis, the individual could perform the requirements of light work, and that the individual would have one environmental limitation that would need to be – to avoid temperature extremes in the work. Assuming these things, would there be jobs that exist in several regions in the national economy that such an individual could perform?

(R. 296.) In response, the vocational expert testified that with those findings, jobs did exist and he suggested packer-inspector, 500,000 jobs nationally, assembler, 717,000 jobs nationally, or sorter-grader, 84,000 jobs nationally. (Id.) The vocational expert further testified that these jobs ranged in exertion level from sedentary to medium or heavy. (Id.)

Plaintiff's counsel then asked the vocational expert to consider an additional non-exertional limitation based on Plaintiff's testimony–an individual such as Plaintiff who would lack the ability to maintain concentration, to complete tasks from beginning to end in a work-like setting–and opine

as to whether such individual would be employable. (R. 297.) The vocational expert, after clarifying a couple of points, opined that there would be no jobs such an individual could perform. (Id.)

The ALJ then followed up with another hypothetical question, starting with the same assumptions as in his first hypothetical, and added the restriction of being limited to simple, routine, repetitive tasks, and then asked the vocational expert if such an individual would be able to perform the same jobs as previously identified. (R. 297-98.) The vocational expert responded in the affirmative. (R. 298.)

Plaintiff's counsel then asked the vocational expert to assume the assumptions in the last hypothetical posed by the ALJ and to add to that the additional non-exertional limitation of headaches with an intensity level of a 9 or 10 out of 10 which would cause an individual to be unable to remain on task, and to opine as to whether this would have any effect. (R. 298.) In response, the vocational expert testified that "[w]ith the frequency and duration of the headaches as described, if it took him off task for that period of time, there would be no jobs he could perform." (Id.)

III. **THE ALJ'S DECISION**

On April 25, 2007, the ALJ issued his decision, denying Plaintiff's claim for benefits. (R. 16-30.) In his evaluation of the evidence, the ALJ lists the conditions that Plaintiff alleged to have caused him to be disabled on July 28, 2003: "head and neck injury, dizziness, a bad memory, neck and back pain and numbness in the left arm and hand."[7] (R. 17.)

_____

7. Although the disability report completed by Plaintiff also listed "bad headaches" (R. 67), the ALJ omitted this condition from his list of conditions.

At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 28, 2003.  (R. 17.)  At step two, the ALJ determined that Plaintiff possessed the following severe impairments, which caused significant limitation in Plaintiff's ability to perform basic work activities:  "status post closed head injury and cognitive disorder due to his head injury, personality change due to head injury, and a major depressive disorder."  (R. 18.)  The ALJ then determined at step three that the medical evidence indicated that Plaintiff's impairments were severe within the meaning of the Regulations, but not severe enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, in particular, Listings 12.02 and 12.04.  (Id.)

At step four, the ALJ assessed Plaintiff's residual functional capacity to perform the requirements of his past relevant work, or other work existing in significant numbers in the national economy.  In so doing, the ALJ considered Plaintiff's testimony at the administrative hearing, noting specifically Plaintiff's complaints of memory problems and pain in the left side of his head and neck, problems sleeping due to his pain, and severe headaches while attempting to return to work on two occasions.  (R. 20.)  The ALJ also thoroughly considered all of the medical records, including the report of Dr. Franzen, and the reports and treatment notes of Plaintiff's treating neurologists, Doctors Resnick and Zaretskaya, as well as the results of the diagnostic tests in the record.  (R. 20-26.)  After thorough review of the entire record, the ALJ determined that Plaintiff retained the residual functional capacity to perform light work or work which required lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently, and was limited to work requiring simple, routine, repetitive tasks and should avoid temperature extremes.  (R. 27.)  In reaching this conclusion, the ALJ explained that the evidence showed that despite his head injury in July 2003, for which he

received an extensive work-up and follow up treatment, Plaintiff was currently able to retrieve and retain information in the average range. (Id.) With regard to his headaches, the ALJ found that Dr. Zaretskaya noted in April 2004 that although Plaintiff continued to have some headaches and residual memory problems, he had achieved dramatic improvement with his headaches. (Id.) The ALJ further noted that in June 2004, Plaintiff was not on any medications at all, and although he had been diagnosed with possible multiple sclerosis based on an MRI, Plaintiff was not exhibiting any clinical symptoms as yet. Also, the ALJ noted that in July 2005, Dr. Zaretskaya reported that Plaintiff declined treatment for his MS, and stated that he was feeling wonderful and wanted to return to work; Dr. Zaretskaya opined that he did not see any reason for him not to go back to work at that time. Subsequently, in February 2006, it was noted that Plaintiff was again evaluated for headaches and prescribed NSAIDS and physical therapy, and a repeat MRI scan of the brain, which disclosed asymptomatic MS. Thus, the ALJ concluded:

> the undersigned declines to accept [Plaintiff's] testimony that he is totally disabled due to memory problems. In so far as the [Plaintiff]'s alleged inability to work, the undersigned finds that his statements are less than credible. The [Plaintiff] functions quite adequately and is capable of daily living. He is capable of sustaining simple, routine, repetitive tasks and concentrating well enough to carry out tasks. The medical evidence of record simply does not support the alleged severity of his subjective complaints. The undersigned concludes that the [Plaintiff]'s impairments are not disabling and that he is capable of performing a wide range of light work.

Id. Based on this RFC, the ALJ concluded that Plaintiff could not return to his former employment as a tractor trailer truck driver, as that job was classified as heavy exertion and semi-skilled. (R. 27-28.)

Accordingly, the ALJ proceeded to step five, and asked a vocational expert to provide information as to whether jobs existed in the national economy for an individual of Plaintiff's age,

education, past relevant work experience and residual functioning capacity.  (R. 29.)  Based on the

vocational expert's testimony, the ALJ concluded that Plaintiff was capable of making a successful

adjustment to work that exists in significant numbers in the national economy.  Accordingly, the

ALJ ultimately found that Plaintiff was not disabled, as that term is defined in the Social Security

Act, at any time through the date of his decision.  (Id.)

## IV.   "SUBSTANTIAL EVIDENCE" STANDARD OF REVIEW

In reviewing an administrative determination of the Commissioner, the question before any

court is whether there is substantial evidence in the agency record to support the findings of the

Commissioner that the plaintiff failed to sustain his burden of demonstrating that he was disabled

within the meaning of the Social Security Act. 42 U.S.C. § 405(g).   See also, e.g., Richardson v.

Perales, 402 U.S. 389 (1971); Adorno v.  Shalala,  40  F.3d 43  (3d Cir. 1994).

More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the record,
> a judgment affirming, modifying, or reversing the decision of the Commissioner of
> Social Security, with or without remanding the cause for a rehearing.  The findings
> of the Commissioner of Social Security as to any fact, if supported by substantial
> evidence, shall be conclusive . . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing

Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).

Although there may be contradictory evidence in the record, it is not cause for remand or reversal

of the Commissioner's decision if substantial support exists.  Sykes v. Apfel, 228 F.3d 259, 262 (3d

Cir. 2000).

The Third Circuit has noted that evidence is not substantial "if it is overwhelmed by other

evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); see also Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986).  In addition, despite the deference due to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence."  Smith v. Califano, 637 F.2d 968, 970 (3d  Cir. 1981).  Finally, the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."  Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001) (quoting SEC v. Chenery, 318 U.S. 80, 87 (1943)).

## V.    **DISABILITY EVALUATION**

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the finding of the Commissioner that Plaintiff was not disabled within the meaning of the Act, but had the residual functional capacity to perform a form of substantial gainful employment.

The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. § 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for

him, or whether he would be hired if he applied for work. For purposes of the preceding sentence . . . 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).[8]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability. The regulations, published at 20 C.F.R. §§404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[9] In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity. If not, then the severity of the plaintiff's impairment must be considered. If the impairment is severe, then it must be determined

---

8. In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence. See Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.").

In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of his daily activities. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed in Section C, supra. See Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing Bittel and concluding that where "plaintiff did not satisfy the fact finder in this regard, so long as proper criteria were used, [it] is not for us to question"); see also Kephart v. Richardson, 505 F.2d 1085, 1089 (3d Cir. 1976) (noting that credibility determinations of ALJ are entitled to deference).

9. This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. See, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

whether it meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does not meet or equal the Listings, then it must be ascertained whether the plaintiff can do his past relevant work. If not, then the residual functional capacity ("RFC") of the plaintiff must be ascertained, considering all of the relevant evidence in the file, to assess whether the plaintiff has the ability to perform other work existing in the national economy in light of plaintiff's age, education and past work experience.[10]

Plaintiff bears the burden of proof at Steps 1 through 4. Thus, once the ALJ finds that the plaintiff is unable to perform his past relevant work, as in the present case, the burden then shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates his residual functional capacity. *See* 20 CFR § 404.1520; Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).[11] Thus, it must be determined whether or not there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act.

## VI.    ANALYSIS

10. The finding of residual functional capacity is the key to the remainder of findings under the regulations. If the plaintiff's impairment is exertional only, (i.e., one which limits the strength he can exert in engaging in work activity), and if his impairment enables him to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made. If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts. See 20 C.F.R. § 404.1569; Appendix 2 to Subpart P of Part 404, Title 20, § 200.00(a).

11. The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert. See Jesurum v. Sec'y of the U.S. Dep't of Health & Human Serv., 48 F.3d 114, 119 (3d Cir. 1995).

Plaintiff claims the ALJ erred in three respects: (1) the ALJ erred as a matter of law at step two of the sequential evaluation process when he found that Plaintiff's headaches following his accident were not severe, despite evidence that his headaches had more than a *de minimus* impact on his ability to work; (2) the ALJ erred as a matter of law at step five when he failed to include, explicitly or implicitly, any limitations related to Plaintiff's headaches in his hypothetical question to the vocation expert and therefore, the vocation expert's response does not provide substantial evidence to support the ALJ's decision to deny benefits; and (3) the ALJ committed clear error when he failed to take in to account Plaintiff's military service and work history of twenty-plus years in making his credibility assessment of Plaintiff. Each of these alleged errors is discussed in turn.

### A. Whether the ALJ Erred in Failing to Include Headaches as a Severe Impairment at Step Two

Plaintiff initially contends that the ALJ erred as a matter of law when he found at step two that Plaintiff's headaches following his accident were not severe.[12] Plaintiff argues that in determining whether an impairment is severe, the standard to be applied is a *de minimis* one, which is designed to weed out only the most undeserving disability claims, citing in support Bowen v. Yuckert, 482 U.S. 137 (1987), Newell v. Barnhart, 347 F.3d 541 (3d Cir. 2003), and McCrea v. Barnhart, 370 F.3d 357 (3d Cir. 2004).[13] In further support of his argument, Plaintiff relies on Social

---

12. In actuality, the ALJ found that Plaintiff's closed head injury was a severe impairment, but never specifically found one way or the other whether Plaintiff's headaches were severe within the meaning of the regulations. Plaintiff later concedes this point. (Doc. 12 at 15.)

13. The court of appeals has opined that the commissioner's denial of benefits at step two should be reviewed with close scrutiny, in light of its recognition that "'[t]he step two inquiry is a *de minimis* screening device to dispose of groundless claims.'" McCrea, 370 F.3d at 360 (quoting Newell, 347 F.3d at 546 (other citation omitted)). However, that does not mean that a more stringent standard of review should be applied. Rather, "the Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence on the record as a whole." Id. at 360-61 (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)). Moreover, it bears mentioning that unlike the ALJ in McCrea and Newell, the ALJ in the case at bar did not deny benefits at step two of

<u>Security Ruling 85-28</u>, which provides the following explanation for determining whether an impairment or combination of impairments is severe at step two:

> An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

<u>SSR 85-28</u>, 1985 WL 56856, *3 (1985). Plaintiff submits that under this standard, the medical evidence shows that while Plaintiff's headaches may not have been disabling in and of themselves, they certainly had more than a *de minimis* impact on his ability to perform jobs, and indeed, the vocational expert testified that the headaches disabled him from all work. Thus, Plaintiff contends that by minimizing his headaches, quoting out of context one medical record which showed (temporary) improvement in 2004, and failing to make a finding one way or the other as to the severity of his headaches, the ALJ either (1) de facto determined that his headaches were not severe, or (2) erred in failing to include any headache-related limitation in his hypothetical question to the vocational expert. (Doc. 12 at 15-16.)

In response, the Commissioner argues that the evidence does not support Plaintiff's claims that his headaches limit his ability to work. (Doc. 15 at 13.) In support of this argument, the Commissioner points to the following evidence: a normal EEG (R. 193); reported improvement in his headaches following a course of Prednisone (R. 182); in April 2004, dramatic improvement in his headaches after a course of physical therapy (R. 206); in June 2004, a report of intermittent headaches with a reduction in severity, with which Plaintiff indicated he could certainly function,

_____

the sequential evaluation, but rather, denied benefits at step five.

25

and a physician's note indicating Plaintiff was no longer taking any medications at that time and was looking forward to returning to work (R. 202-03); in July 2005, a report that Plaintiff was feeling wonderful and would like to return to work (R. 230); in December 2005, no complaints of headaches noted during an office visit for an ankle injury (R.228-29). The Commissioner further submits that although Plaintiff complained of occipital headaches in February 2006 to Dr. Barmada, who recommended physical therapy, x-rays of cervical spine to rule out spondylosis, an eye evaluation, and an MRI,[14] Plaintiff did not submit any of those treatment records into evidence, and therefore, without diagnostic and clinical evidence of a medical condition that could reasonably be expected to produce the complaint of pain, Plaintiff's bald complaint is insufficient to establish a disabling condition.[15] (Doc. 15 at 14.) Finally, the Commissioner notes that evidence regarding Plaintiff's ADLs indicated a level of functioning that belied his claim that his headaches significantly impaired his ability to perform work-related activities. (Id. at 15.) Therefore, the Commissioner argues, Plaintiff's argument that the ALJ did not give sufficient consideration to his headaches must fail.

In reply, Plaintiff submits that the Commissioner failed to discuss whether Plaintiff's headaches were a severe impairment, i.e., whether the condition imposed any work related limitations of function. Consequently, Plaintiff argues that this omission makes it impossible for this Court (or any reviewing third party) to know if the ALJ even considered the effect of Plaintiff's

14. From the Court's review of the record, the treatment notes also indicate that Dr. Barmada recommended that Plaintiff continue on Ibuprofen, repeat the MRI in December of 2006, and return for a follow up visit in one year (i.e., February 2007). (R. 264, 266.)

15. The Commissioner's argument is disingenuous for two reasons. First, the treatment records for the MRI and follow up visit would not have even existed until 9 months and 11 months, respectively, after the hearing. Second, the record is replete with evidence of an underlying medical condition that could reasonably be expected to be the source of Plaintiff's headaches–status/post accident closed head injury with loss of consciousness and demyelinating disorder suggestive of MS–asymptomatic. Therefore, the Commissioner's argument on this front is somewhat misleading.

headaches in making the decision that Plaintiff was not disabled.  (Doc. 16 at 2.)   In further response, Plaintiff argues that the Commissioner side steps his argument–that the ALJ failed to discuss whether his headaches were a severe impairment within the meaning of the Regulations– and instead argues that Plaintiff's headaches did not prevent him from performing simple, routine, repetitive work (i.e., Plaintiff's headaches are not disabling), and discussed at length the medical evidence in support thereof.  Plaintiff contends the Commissioner is asking the Court to do what it is prohibited from doing–to supply what is missing from the ALJ's decision.  (Doc. 16 at 2.) According to Plaintiff, by arguing that Plaintiff is limited to simple, routine tasks because of his headaches, the Commissioner has implicitly conceded that Plaintiff's headaches are more than minimal.  (Doc. 16 at 2-3.)   Finally, Plaintiff submits that the Commissioner's failure to even address his arguments suggests the Commissioner cannot deny Plaintiff's allegation that the ALJ failed to discuss whether his headaches were severe and any resulting work-related limitation. (Doc. 16 at 3.)  Therefore, Plaintiff maintains that remand is necessary for consideration of his headaches and any related limitation.

Although the Plaintiff's burden at step two is not a heavy one, the Court finds that the ALJ's omission of Plaintiff's headaches from the list of severe impairments at step two is supported by substantial evidence.  The Regulations define a non-severe impairment as "[a]n impairment or combination of impairments . . . [that] does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  Basic work activities refer to the "abilities and aptitudes necessary to do most jobs."  20 C.F.R. §404.1521(b).  Examples of basic work activities include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and

remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations; and" "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b)(1)-(6).  Thus, an impairment is not severe if the evidence establishes only a slight abnormality that has no more than a minimal effect on an claimant's ability to work.  Newell, 347 F.3d at 546 (citing SSR 85-28, 1985 WL 56856, at *3).  The burden of showing that an impairment is severe rests with the claimant.  Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 145, 2007 WL 1827129, at *2 (3d C ir. Jun. 26, 2007) (citing Bowen v. Yuckert, 482 U.S. at 146 n.5)  "Reasonable doubts on severity are to be resolved in favor of the claimant."  Newell, 347 F.3d at 547 (footnote omitted).

In the instant appeal, the record shows that the ALJ considered Plaintiff's complaints of headaches and their effect on his ability to work, and the record evidence supports the omission of headaches from the list of severe impairments at step two.  In his recitation of the medical evidence, the ALJ specifically noted  Plaintiff's complaints of headaches in the neurologists' treatment notes dated October 16, 2003, November 25, 2003, February 5, 9, and 12, 2004, April 23, 2004, June 15, 2004, June 28, 2004, and February 28, 2006.  (R. 21-26.)  The ALJ also noted that on April 23, 2004, the neurologist's treatment notes indicated that Plaintiff reported  achieving dramatic improvement with his headaches as a result of physical therapy and, by June 28, 2004, his headaches were intermittent and not as severe, and Plaintiff indicated he could certainly function with that; he was no longer taking any medications and was looking forward to returning to work.  (R. 24-25.)  The ALJ further noted that on July 28, 2005, Plaintiff reported to his neurologist that he was feeling wonderful and wanted to return to work, and his neurologist indicated she saw no reason why he could not return to work at that time. (R. 26.)  The ALJ also noted that when Plaintiff was evaluated

on February 28, 2006 for his headaches, the only treatment recommended was NSAIDS, physical therapy, MRI scan of the brain, with a diagnosis of asymptomatic MS. (Id.)

Moreover, at the disability hearing, Plaintiff testified that he was suffering from a headache and his pain level currently was 3 out of 10, and a pain level of 9 out of 10 occurred only sometimes at night. (R. 290.) The ALJ also relied on Plaintiff's testimony regarding his ADLS, and found that Plaintiff was able to function quite adequately and was capable of performing a wide range of daily activities, including household chores. (R. 18, 27.)

Thus, the ALJ's assessment at step two is consistent with both the medical evidence and Plaintiff's own testimony regarding his ADLs and the pain level of his headaches. Accordingly, substantial evidence supports the ALJ's exclusion of headaches from the list of severe impairments at step two.

Even if the Court was to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments. Salles, 229 Fed. Appx. at 145 n. 2 (citing Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005)); Barnett v. Astrue, Civ.A.No. 07-cv-1036, 2008 WL 5114266, * 7 (W.D.Pa. Nov. 25, 2008) (citing Lee v. Astrue, 2007 WL 1101281, at *3 n.5 (E.D.Pa. Apr. 12, 2007); Salles, supra); Kreuzberger v. Astrue, Civ.A.No. 07-529, 2008 WL 2370293, * 8 (W.D.Pa. Jun. 9, 2008) (citing Salles, supra). Here the ALJ proceeded with the sequential evaluation process and denied benefits at step five. In so doing, the ALJ considered all of Plaintiff's impairments, including his headaches, in determining his residual functional capacity. Accordingly, even if the ALJ had found that Plaintiff's headaches were a severe impairment, such a finding would not have changed the

ALJ's assessment, and thus, any error was harmless.

### B.     Whether the ALJ Erroneously Failed to Include any Limitations Related to Plaintiff's Headaches in his Hypothetical Question

Next, Plaintiff contends that the ALJ erred when he failed to include any headache related limitation in his hypothetical question to the vocational expert. In support, Plaintiff submits that the ALJ was clearly referring only to the long-term cognitive effect of his head injury when he declined to accept Plaintiff's testimony that he was totally disabled due to memory problems. Thus, according to Plaintiff, it was "certainly clear error for the ALJ to have omitted any reference whatsoever to the effect of his headaches in his residual functional capacity assessment or hypothetical question to the vocational expert[,]" especially in light of the fact that the vocational expert, when asked to specifically consider the effect of the headaches, stated they would prevent all types of work. (Doc. 12 at 20-21.) In response, the Commissioner argues that the evidence does not support the degree of impairment that Plaintiff has alleged with regard to his headaches, and therefore, the ALJ was not obligated to include a headache related limitation in his hypothetical question. The Court finds no merit to Plaintiff's argument.

In order for the Court to find that a hypothetical question was based on substantial evidence, the "hypothetical question must reflect all of a claimant's impairments *that are supported by the record.*" Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984); Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983)) (emphasis added); Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004) (citing Chrupcala, supra; other citations omitted). In Burns v. Barnhart, the Court of Appeals, in discussing hypothetical questions posed to vocational experts, explained: "'[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative

employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.'" 312 F.3d 113, 123 (3d Cir. 2002) (quoting <u>Podedworny</u>, 745 F.2d at 218). Stated another way, where medically undisputed evidence of specific impairments exists in the record and such impairments are not included in the hypothetical, the vocational expert's response is not considered substantial evidence at Step Five. <u>Id.</u> (citing <u>Podedworny</u>, <u>supra</u> (citing <u>Wallace</u>, 722 F.2d at 1155)).

The Court of Appeals noted, however, in <u>Ramirez</u>, that if the ALJ's omission of a certain limitation from the hypothetical could be explained by the evidence of record,[16] then the hypothetical would be legally sufficient, and thus, the ALJ's decision would be supported by substantial evidence. 372 F.3d at 555. Recently in <u>Johnson v. Comm'r</u>, the Court of Appeals applied this same reasoning when it held that a limitation asserted by the claimant regarding fine manipulation did not accurately portray her medical impairment, as such a limitation was not supported by the medical evidence, and therefore, the ALJ was not required to incorporate it into the hypothetical question. <u>Johnson v. Comm'r</u>, 529 F.3d 198, 206 (3d Cir. 2008). In so holding, the Court of Appeals observed:

> "We do not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant." Rather, "the hypotheticals posed must 'accurately portray' the claimant's impairments and [ ] the expert must be given an opportunity to evaluate those impairments 'as contained in the record.'"

---

16. For example, in <u>Ramirez</u>, the Court of Appeals found a valid reason for omitting a specific limitation might exist where the ALJ concluded from the record that the deficiencies in concentration, persistence and pace were so minimal or negligible that they would not limit the claimant's ability to perform simple tasks under a production quota. 372 F.3d at 555. In <u>Ramirez</u>, the Court of Appeals found that the record did not provide a valid reason for the omission, and therefore, found the hypothetical deficient in its lack of specificity regarding the claimant's mental limitations. <u>Id.</u>

Id. (quoting Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (citation omitted)).

In the present appeal, the Court finds that the ALJ included all of the limitations supported by the evidence of record, and therefore, the hypothetical question was not legally deficient. As stated above, a review of the record reveals that the ALJ duly considered all of the relevant evidence and reasonably concluded that Plaintiff's headaches were not severe. Although the ALJ found that Plaintiff suffered from medically determinable physical impairments that could reasonably be expected to produce the alleged headaches complained of by Plaintiff, he found Plaintiff's statements regarding the limiting effects of his headaches were not fully credible in light of his dramatic improvement with treatment, long periods of time without any complaints, and his ability to function quite adequately and perform a wide range of activities of daily living. The ALJ adequately explained why he did not give full credit to Plaintiff's complaints of headaches, which the Court finds is supported by the record evidence.

Moreover, in making his finding regarding Plaintiff's residual functional capacity, it is clear the ALJ considered the effect of both Plaintiff's memory problems and headaches on his ability to work. After discussing the medical evidence regarding Plaintiff's headaches and memory problems, the ALJ concluded that the medical evidence of record simply did not support the alleged severity of his subjective complaints. (R. 27.) It can certainly be inferred from this statement that one of the subjective complaints to which the ALJ was referring was headaches, as he discussed this condition immediately before stating his conclusion. Therefore, the Court rejects the Plaintiff's argument that the ALJ omitted any reference to the effect of Plaintiff's headaches in his residual functional capacity assessment.

Equally unconvincing is Plaintiff's argument that a headache related limitation should have

been included in the hypothetical, in light of the fact that the vocational expert, when asked to specifically consider the effect of the headaches, stated they would prevent all types of work. Plaintiff's argument fails to note that the vocational expert was asked to assume the additional limitation of headaches at an intensity level of 9 or 10 out of 10, yet Plaintiff's own testimony, as well as the medical evidence, belies that the headaches were at such a pain level on a regular basis. Plaintiff testified only that he sometimes experiences headaches at that pain level at night. Moreover, since April of 2004, the medical evidence shows mostly intermittent headaches, with dramatic improvement, and at a level that allows Plaintiff to function.

Because the ALJ reasonably determined that Plaintiff's complaints of limitations due to headaches were not fully credible, the ALJ was justified in omitting a headache related limitation from the hypothetical. Therefore, the Court concludes that the ALJ's determination at step five was supported by substantial evidence.

C.  **Whether the ALJ Erred in Failing to Consider Plaintiff's Military Service & 20 Plus Years Work History in Making His Credibility Assessment of Plaintiff**

Finally, Plaintiff argues that a claimant who has a long and productive work history must be given significant credibility when describing his work limitations, citing in support Rieder v. Apfel, 115 F.Supp. 2d 496, 505 (M.D.Pa. 2000). (Doc. 12 at 22-23.) According to Plaintiff, the ALJ's failure in this regard constitutes clear error, particularly in a case where pain complaints are a significant component. (Doc. 12 at 23.) Plaintiff concedes, however, that the ALJ's failure to take into consideration the Plaintiff's exemplary work record and military service in making a credibility determination, standing alone, would not likely be considered a basis for remand. (Id. at 24.) The Commissioner does not provide a response to this argument.

Plaintiff's final argument also lacks merit. It is clear from the record that the ALJ followed Social Security Ruling 96-7p, July 2, 1996,[17] in finding that Plaintiff's allegations of his work limitations were not entirely credible. Generally, it is well established that when a claimant's subjective testimony of his inability to perform even light or sedentary work is supported by competent medical evidence, the ALJ is required to give great weight to the claimant's testimony. Schwartz v. Halter, 134 F.Supp. 2d 640, 654 (E.D.Pa. 2001) (citing Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999)) (other citation omitted). It is also clear that "a claimant is entitled to substantial credibility if he has a work record of continuous employment for a substantial duration of time." Morrow v. Apfel, No. 99-732-SLR, 2001 WL 641038, *10 n.9 (D. Del. Mar.16, 2001) (citing Bazemore v. Heckler, 595 F.Supp. 682, 688 (D. Del. 1984)) (holding claimant should be accorded substantial credibility as he owned his own business for 15 years.) However, in the instant appeal, the competent medical evidence, as discussed above, supports the ALJ's finding that Plaintiff's limitations from headaches were not severe, i.e., had no more than a minimal effect on his ability to work.

In addition, the ALJ's decision contains specific reasons for his credibility finding, which is supported by the record evidence. In particular, the ALJ set forth the medical evidence he relied

---

17. In particular, SSR 96-7p provides:
> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

See also Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (citations omitted) (in determining claimant's RFC, ALJ must review all relevant medical and non-medical evidence and explain his conciliations and rejections); Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121-22 (3d Cir. 2000) (citations omitted) (same).

on in making his credibility determination,[18] and then stated:

> [T]he undersigned declines to accept his testimony that he is totally
> disabled due to memory problems. In so far as the claimant's alleged
> inability to work, the undersigned finds that his statements are less
> than credible. The claimant functions quite adequately and is capable
> of daily living. He is capable of sustaining simple, routine, repetitive
> tasks and concentrating well enough to carry out tasks. The medical
> evidence of record simply does not support the alleged severity of his
> subjective complaints. The undersigned concludes that the
> claimant's impairments are not disabling and that he is capable of
> performing a wide range of light work.

ALJ's Decision dated April 25, 2007 at 12. (R. 27.) Although the ALJ does not specifically refer

to Plaintiff's extensive work history in making his credibility determination, that is but one factor

to be considered[19] and, in any event, the ALJ's credibility determination is supported by substantial

evidence, including the medical evidence and Plaintiff's own testimony regarding his ADLs and

work limitations. Accordingly, the Court finds that the ALJ did not err in failing to specifically

---

18. Specifically, the ALJ noted the medical evidence showed dramatic improvement in Plaintiff's
headaches, neuropsychological testing showed an ability to retrieve and retain information in the average
range, and the MRI disclosed asymptomatic MS; Plaintiff's recommended treatment as of February 2006
consisted of only NSAIDS and physical therapy; Plaintiff's testimony that he wanted to return to work
and he was quite capable of functioning on his own and performing a wide range of ADLs; his treating
neurologist's opinion that she saw no reason why Plaintiff could not return to work. (R. 27.)

19. In evaluating the intensity and persistence of a claimant's symptoms, the ALJ must "consider all of
the available evidence, including [the claimant's] medical history, the medical signs and laboratory
findings, and statements from [the claimant], his treating or examining physician or psychologist, or other
persons about how [the] symptoms affect [the claimant], . . . and the medical opinions of [the claimant's]
treating source and other medical opinions." 20 C.F.R. § 404.1529(c)(1). The ALJ must also consider
and weigh all of the non-medical evidence such as information about the claimant's prior work record,
observations by SSA employees and other persons. 20 C.F.R. § 404.1529(c)(3); Burnett, 220 F.3d at 122
(citations omitted). Finally, the ALJ must take into consideration factors relevant to the claimant's pain
or other symptoms, such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and
intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage,
effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other
than medication, received for relief of the symptoms; (6) measures used to relieve the symptoms; (7) other
factors relating to the claimant's functional limitations and restrictions due to the symptoms. SSR 96-7p
(citing 20 C.F.R. § 404.1529(c)) (other citation omitted).

discuss Plaintiff's military service and 20 plus years work history in making his credibility assessment of Plaintiff.

## VII.  <u>CONCLUSION</u>

In light of the deferential standard of review in this social security appeal, the Court is constrained to find that the ALJ reasonably concluded that Plaintiff's asserted limitation as to his headaches was not severe, and in any event, not entirely credible in light of all the record evidence. Therefore, the hypothetical posed by the ALJ was not legally deficient.  Accordingly, the Court holds that the ALJ's decision of no disability based on the VE's testimony at Step 5 is supported by substantial evidence.  Thus, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the Commissioner of Social Security to deny Plaintiff's application for benefits  will be affirmed.  The Court will enter an order consistent with this opinion.

Dated:  May 8, 2009                            By the Court:

LISA PUPO LENIHAN
United States Magistrate Judge

cc:      All Counsel of Record
         *Via Electronic Mail*